UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | |
|---|---|---|
| DAVID WAYNE GREEN | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Cause No.: 2:05-CV-213 PS |
| | ) | |
| UNITED STATES STEEL | ) | |
| CORPORATION and UNITED | ) | |
| STEELWORKERS OF AMERICA, | ) | |
| | ) | |
| Defendants. | ) | |

**OPINION AND ORDER**

Plaintiff David Wayne Green was found sleeping on the job and later failed a drug test. As a result, his employer, United States Steel Corporation, required him to sign a last chance agreement and Green responded by suing them for age discrimination under the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.*, and race and sex discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. Before the Court is U.S. Steel's unopposed motion for summary judgment. [DE 18] Because Green failed to meet the legitimate expectations of his employer, the motion for summary judgment is granted.

**I. FACTS**

Green began his employment with National Steel Corporation at its Midwest Division in Portage, Indiana on November 4, 1970. (Green Dep. 10.) At all times during his employment with National Steel, Green worked in a variety of jobs in the Transportation Department. (Green Dep. 12-19) Green continued his employment at National Steel's Midwest plant until May 20, 2003, when U.S. Steel took ownership of the plant. (Green Dep. 11) Green then became an

employee of U.S. Steel. *Id*. Green was a member of the United Steelworkers of America, Local Union 6103. (Green Dep. 19-20)

When Green began his employment with U.S. Steel, his incumbent position was Utility Technician. (Simpson Aff. ¶ 6; Green Dep. 12) Green also served as a Crew Leader which was similar to certain foreman/coordinator assignments he held at National Steel. (Green Dep. 24-25, 30, 39) Under a 2003 Labor Agreement between U.S. Steel and Green's union, Crew Leaders such as Green are paid $1 per hour more than the highest position that they supervise. (Green Dep. 25-26, 68-69)

Pursuant to standard procedures at the U.S. Steel Midwest plant, an employee found sleeping at work must undergo a "for cause" drug test. (Simpson Aff. ¶ 7.) When the employee arrives for a "for cause" drug test, the collector identifies the employee; administers a breath alcohol test; and the employee then provides a urine sample in a specimen container. The collector takes the sample and performs an "Express Test," which shows the preliminary results in a matter of minutes. (Tokowitz Dep. 11; Simpson Aff. ¶ 9) If the Express Test is positive, the specimen container is closed and sealed with tamper-proof seals and sent to an off-site lab for confirmatory testing. (Tokowitz Dep. 11-12, 20-21, 31; Tokowitz Dep. Ex. 2; Simpson Aff. ¶ 10) If the Express Test shows a positive result, the employee is given a Class 3 designation by the medical department, which bars the employee from the plant until he is cleared by the medical department. (Tokowitz Dep. 31-32; Simpson Aff. ¶ 11)

As a matter of course, if the confirmatory tests performed at the off-site laboratory confirm the Express Test positive result, U.S. Steel issues the employee a five-day suspension subject to discharge for being under the influence of an illegal substance. (Simpson Aff. ¶ 12)

2

Pursuant to the 2003 Labor Agreement, U.S. Steel is obligated to offer employees who test positive for drugs the opportunity for rehabilitation instead of discharge pursuant to a Last Chance Agreement.  (Green Dep. 119; Green Dep. Ex. 8; Ex. 9 at ¶ 7; Simpson Aff. ¶ 13)

On May 28, 2004, at 2:40 a.m., Midwest Plant Protection Officer G. Ginaven discovered a truck with its engine running and lights off in an area east of the coil pads.  (Green Dep. Ex. 2)  Officer Ginaven checked the vehicle and found an employee, later identified as Green, lying asleep across the front seat.  (Green Dep. Ex. 2; Green Dep. 72, 77)  Officer Ginaven waited at the truck for approximately 15 minutes and Green never moved except to breathe.  Officer Ginaven also shined his flashlight on Green's face, but even this did not cause Green to move.  (Green Dep. Ex. 2)  Officer Ginaven then tapped on the truck window with his flashlight and Green jumped up.  (Green Dep. Ex. 2)

Officer Ginaven advised Green that the U.S. Steel policy in response to an employee sleeping on the job is that the employee was required to submit to a drug test. (Green Dep. 75) Officer Ginaven then asked Green to accompany him to the medical department for a drug test. (Green Dep. Ex. 2; Green Dep. 75)  At approximately 3:30 a.m., Officer Ginaven completed an incident report detailing his discovery of Green.  (DE 20, Ex. B)

That same day Green underwent a drug test in the medical department.  He provided a urine sample to the medical department technician and she ran an Express Test on a specimen of the sample.  (Green Dep. 83-84; Green Dep. Ex. 3)  The Express Test showed a positive result for marijuana and the technician advised Green of this result.  (Green Dep. 84-85; Green Dep. Ex. 3; Tokowitz Dep. 17; Tokowitz Dep. Ex. 1)  The technician then sealed the remainder of Green's urine sample with a tamper-proof seal in his presence and sent it to a certified off-site

3

laboratory for confirmatory testing.  (Green Dep. Ex. 4; Green Dep. 85-86; Tokowitz Dep. 20-21; Tokowitz Dep. Ex. 2)  Green was then given discharge instructions, told to go home, and not to "come back until you're called," which is consistent with U.S. Steel procedure for an employee who receives a Class 3 designation. (Green Dep. 106-07; Tokowitz Dep. 31-32; Simpson Aff. ¶ 11)  The off-site lab test results later confirmed a positive result for marijuana. (Green Dep. Ex. 5; Tokowitz Dep. Ex. 3; Green Dep. 102-03; Tokowitz Dep. 39)

After Green tested positive for marijuana, Mike Simpson, a Labor Contract Administrator at the Midwest Plant, was assigned to Green's case.  (Simpson Aff. ¶ 3, 17)  Once U.S. Steel received the off-site lab test results dated June 12, 2004, Green's Union representative, Terry Pappas, advised him that he had tested positive for marijuana.  (Green Dep. 107)  On June 15, 2004, Green attended a meeting with Pappas, and U.S. Steel representatives, Mike Simpson, John Lute and Tim Greene.  (Green Dep. 114; Simpson Aff. ¶ 18)  During this meeting, Green was shown a copy of the off-site lab test results.  (Green Dep. 108-09; Green Dep. Ex. 5; Simpson Aff. ¶ 18)  Green did not offer or attempt to offer any evidence or explanation for the positive test results during the June 15 meeting.  (Green Dep. 105, 115; Simpson Aff. ¶ 19)

During the June 15 meeting, U.S. Steel provided Green with three discipline slips relating to his conduct on May 28, 2004:  1) a written warning for being found in possession of unauthorized reading material; 2) a one-day suspension for failing to follow work instructions; and 3) a five-day suspension subject to discharge for being under the influence of an illegal substance.  (Green Dep. 110-13; Green Dep. Ex. 7; Simpson Aff. ¶ 19)  Green admits that his five-day suspension subject to discharge for being under the influence of an illegal substance was issued as a result of his positive drug test results.  (Green Dep. 113)

Before the June 15 meeting, Pappas advised Green that he may be offered the opportunity to sign a Last Chance Agreement (LCA).  (Green Dep. 110, 120)  Indeed, U.S. Steel was obligated under the 2003 Labor Agreement to offer Green an opportunity for rehabilitation pursuant to a LCA as a result of his positive drug test.  (Green Dep. 119; Green Dep. Ex. 8, ¶ 4; Green Dep. Ex. 9, ¶ 7)  Accordingly, during the June 15 meeting, Green was offered the opportunity to sign a LCA, and he did sign it voluntarily.  (Green Dep. 109, 111, 125-26; Green Dep. Ex. 9; Simpson Aff. ¶ 19)  Green admits that he was not required to sign the LCA offered to him, and that he could have refused to sign it, had his suspension converted to discharge, and proceeded with the grievance procedure.  (Green Dep. 125)

Under his LCA, Green voluntarily agreed, among other provisions, to immediately submit to evaluation by the Employee Assistance Program (EAP); to complete a rehabilitation program determined by the EAP; to totally abstain from the use of any alcohol or drugs not prescribed for his personal use by a licensed physician; and to submit to periodic drug testing at the discretion of the Company without prior notice for the duration of the agreement.  By its terms, the LCA was to remain in effect for five years and any failure by Green to abide by the terms and conditions of the LCA would be considered willful misconduct and result in suspension subject to discharge.  (Green Dep. Ex. 9; Green Dep. 127-30)

Because he signed the LCA, Green was not discharged.  (Green Dep. 117, 127; Green Dep. Ex. 7)  In accordance with the terms of the LCA, Green served an extended suspension from May 28, 2004 until July 21, 2004.  He then returned to U.S. Steel and worked until April 19, 2005.  (Green Dep. 126-27, 129-30, 131-37)  Green has not worked since April 19, 2005

5

because of emphysema, which prevents him from engaging in any work or gainful employment. (Green Dep. 39-40)

A little over a month later, on May 23, 2005, Green filed this suit against U.S. Steel and his union, Local 6103 United Steelworkers of America. [DE 1] Against U.S. Steel, Green asserts race and sex discrimination claims under Title VII, and an age discrimination claim under the ADEA. Against the United Steelworkers union, Green asserts a breach of the duty of fair representation. [DE 1] The union has never appeared in the case, and Green has moved for a default judgment against it. [DE 21, 22] U.S. Steel filed a motion for summary judgment and supporting materials regarding Green's discrimination claims. [DE 16-20] Green did not file a response.

## II. DISCUSSION

### A. Summary Judgment Standards

A party is entitled to summary judgment when, viewing the pleadings and record evidence in the light most favorable to the nonmoving party, "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The party seeking summary judgment has the initial burden to demonstrate an absence of evidence to support the position of the non-moving party. *Doe v. R.R. Donnelley & Sons, Co.*, 42 F.3d 439, 443 (7th Cir. 1994). The non-moving party must then set forth specific facts showing that there is a genuine issue of material fact and that the moving party is not entitled to a judgment as a matter of law. FED. R. CIV. P. 56(e). A genuine dispute about a material fact exists only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248-49 (1986).

Local Rule 56.1 requires any party opposing a motion for summary judgment to "serve and file any affidavits or other documentary material controverting the movant's position, together with a response that shall include in its text or appendix thereto a 'Statement of Genuine Issues' setting forth, with appropriate citations to discovery responses, affidavits, depositions, or other admissible evidence, all material facts as to which it is contended there exists a genuine issue necessary to be litigated."  L.R. 56.1.

Green has not responded to U.S. Steel's summary judgment motion despite having ample time to do so.  *See United States v. Funds in Amount of Thirty Thousand Six Hundred Seventy Dollars*, 403 F.3d 448, 454 (7th Cir. 2005) (where non-moving party did not dispute any of the material facts asserted by the moving party in support of summary judgment, the non-moving party adopted them as true); *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003) ("e have consistently held that a failure to respond by the nonmovant as required by local rules results in an admission"); *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 922 (7th Cir. 1994) (district courts "are not obliged in our adversary system to scour the record looking for factual disputes and may adopt local rules reasonably designed to streamline the resolution of summary judgment motions.").

However, even where an opposing party fails to respond to a summary judgment motion, Rule 56(e) permits judgment for the moving party only "if appropriate – that is, if the motion demonstrates that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law."  *P.S. Johnson v. Gudmundsson*, 35 F.3d 1104, 1112 (7th Cir. 1994) (quoting *Tobey v. Extel/JWP, Inc.* 985, F.2d 330, 332 (7th Cir. 1993)).

7

### B.      Discrimination Claims

Title VII and the ADEA make it unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's" race, sex or age. 42 U.S.C. § 2000e-2(a)(1); 29 U.S.C. § 623(a)(1).

For Green to survive summary judgment, he needs to establish discrimination under the direct or indirect method. Where, as here, there is no direct evidence of discrimination, a plaintiff must use the indirect method and the familiar burden-shifting formula set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Bio v. Fed. Express Corp.*, 424 F.3d 593, 596 (7th Cir. 2005). Under the indirect method, Green has the initial burden to state a prima facie case of discrimination. *Id.* If he satisfies his burden, the burden then shifts to U.S. Steel to articulate a legitimate, nondiscriminatory reason for its actions. *See McDonnell Douglas*, 411 U.S. at 802-03. If this is done, the burden then shifts back again to Green to show by a preponderance of the evidence that the employer's proffered reason is a pretext. *See Wade v. Lerner New York, Inc.*, 243 F.3d 319, 322 (7th Cir. 2001).

To establish a prima facie case of race or sex discrimination, Green must show that (1) he is a member of a protected class; (2) his work performance met his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) he was treated less favorably than similarly situated employees who are in a different class. *Bio*, 424 F.3d at 596; *Whittaker v. Northern Illinois University*, 424 F.3d 640, 647 (7th Cir. 2005) (sex); *Brummett v. Sinclair Broad. Group, Inc.*, 414 F.3d 686, 692 (7th Cir. 2005) (race). The prima facie case for age discrimination under the ADEA is identical, except that the final element requires Green to

8

establish that the alleged similarly-situated employees are "substantially younger" than him. *Franzoni v. Hartmarx Corp.*, 300 F.3d 767, 771-72 (7th Cir. 2002).  If Green fails to satisfy a single element of the prima facie cases, his discrimination claims cannot survive summary judgment.  *Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 465 (7th Cir. 2002).

U.S. Steel concedes that Green is a member of a protected class for his discrimination claims.  But that is the only element of the prima facie case that Green can establish.  Therefore, U.S. Steel is entitled to summary judgment.

*1.     U.S. Steel's Legitimate Expectations*

An employer's expectations are legitimate if they are bona fide.  *Coco v. Elmwood Care*, 128 F.3d 1177, 1179 (7th Cir. 1997).  Where an employer's expectations for an employee were the actual expectations, the court presumes those expectations are bona fide.  *Foster v. Arthur Andersen, LLP*, 168 F.3d 1029, 1035 (7th Cir. 1999).  A plaintiff may rebut this presumption by showing that the expectations are fabricated or by producing evidence showing the expectations were applied in a disparate manner.  *Coco*, 128 F.3d at 1179-80.  Absent such a showing, courts look to see whether the plaintiff met such bona fide expectations.

Green did not meet U.S. Steel's legitimate expectations.  Green was a Crew Leader at U.S. Steel with some supervisory responsibilities.  He fell asleep on the job and failed a drug test.  Moreover, Green was inconsistent in terms of actual job performance, following directions, behavior at work, and in responding to his supervisors' work-related inquiries and requests.  (Def. Answers to Interrog., No. 7.)  Expectations of consistency in these areas are clearly legitimate, and there is no evidence that they were fabricated or applied in a disparate manner.  Green has not presented any evidence that he satisfied U.S. Steel's legitimate expectations.

9

### 2. Adverse Employment Action

An adverse employment action taken by an employer must be materially adverse to be actionable, meaning more than a "mere inconvenience or an alteration of job responsibilities." *Kersting v. Wal-Mart Stores, Inc.*, 250 F.3d 1109, 1115 (7th Cir. 2001) (quoting *Oest v. Illinois Dept. of Corrections*, 240 F.3d 605, 612 (7th Cir. 2001)). "[N]ot everything that makes an employee unhappy is an actionable adverse action. Otherwise, minor and even trivial employment actions that 'an . . . employee did not like would form the basis of a discrimination suit.'" *Id.* (quoting *Oest*, 240 F.3d at 613); *Sweeney v. West*, 149 F.3d 550, 556-57 (7th Cir.1998) (statements issued by employer admonishing employee to improve but not imposing any discipline were not materially adverse).

Green does not dispute that he voluntarily accepted the terms of his Last Chance Agreement. (Green Dep. 125-26; Green Dep. Ex. 9)  Thus, any consequences that he may have suffered by virtue of his LCA were solely the result of his voluntary choice, not any adverse employment actions by U.S. Steel. *See, e.g., Simpson v. Borg-Warner Automotive, Inc.*, 196 F.3d 873, 876 (7th Cir. 1999) (employee's voluntary downgrade was not an adverse employment action where she requested reassignment).

### 3. Similarly-Situated Employees Treated More Favorably

Finally, Green has not pointed to any similarly-situated employee outside of his protected class who was treated more favorably than him. A similarly-situated employee is someone who is "directly comparable" to the plaintiff "in all material aspects." *Herron v. DaimlerChrysler, Co.*, 388 F.3d 293, 300 (7th Cir. 2004) (citation omitted). Green alleged in his complaint that other U.S. Steel employees who tested positive for controlled substances suffered less severe

consequences than him.  (Compl. ¶ 23)  But Green fails to present any evidence to support this allegation.  Green's failure to establish a prima facie case of discrimination under Title VII or the ADEA ends this court's inquiry and the burden never shifts to U.S. Steel.  Accordingly, U.S. Steel is entitled to summary judgment on Green's discrimination claims.

## IV.  CONCLUSION

For the foregoing reasons, Defendant U.S. Steel's Motion for Summary Judgment [DE 18] is **GRANTED**.

**SO ORDERED**.

Entered:  October 12, 2006

>                                s/ Philip Simon
>                                Philip P. Simon, Judge
>                                United States District Court